**Herbert L. MICHEL, Jr., a licensed attorney in the State of Nevada; and Herbert L. Michel, Jr., A Professional Law Corporation, Plaintiffs,**

v.

**Rob W. BARE in his capacity as Bar Counsel to the State Bar of Nevada, Defendant.**

**No. CVS02–1139PMPRJJ.**

United States District Court, D. Nevada.

Nov. 5, 2002.

Hector J. Carbajal, Dennis L. Kennedy, Daniel R. McNutt, Lionel, Sawyer & Collins, Las Vegas, NV, for Plaintiff.

Felicia Galati, State Bar of Nevada, Las Vegas, NV, for Defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, DECLARATORY JUDGMENT AND INJUNCTION

PRO, Chief Judge.

## I. BACKGROUND

Plaintiff Herbert L. Michel, Jr., is a resident of and an attorney licensed to practice law in Nevada. In 1995, Michel formed the Professional Law Corporation of Herbert Michel, Jr., doing business under the registered service marks "Your Legal Power" and "Su Poder Legal" (collectively "Trade Names"). Michel alleges that since 1995, he has expended over $1.2 million promoting the Trade Names.

On July 16, 2001, the Nevada Supreme Court established the Nevada Supreme Court Commission on Multijurisdictional Practice ("Commission") to research a number of issues related to the multijurisdictional practice of law. The Commission conducted three public hearings and collected written comments as part of its study of the issues related to multijurisdictional practice. The study culminated in a Report of the Supreme Court of Nevada Commission on Multijurisdictional Practice ("MJP Report") in which the Commission recommended several changes to the Nevada Supreme Court Rules. Among the recommendations of the Commission adopted by the Nevada Supreme Court on

July 26, 2002, was new Supreme Court Rule 199(1). In relevant part, the Rule provides:

Rule 199. Firm names and letterhead.

1. A lawyer shall not use a firm name, letterhead, or other professional designation that violates Rule 195. The firm name shall contain the names of one or more living, retired, or deceased members of the law firm. No trade names shall be used other than those utilized by non-profit legal services organizations; however, phrases such as "the law offices of" or "and associates" shall be permissible.

. . . .

On September 3, 2002, Michel filed a Motion for Temporary Restraining Order and Preliminary Injunction; Request for Emergency Consideration and Expedited Briefing and Hearing Schedule. (Docs. # 2 & 3.) Michel claims that prohibiting his use of the Trade Names violates his First Amendment right to freedom of speech and Fourth Amendment right to equal protection of the laws. As a result, Michel brings this action for declaratory and injunctive relief against Defendant Robert W. Bare ("Bare"), in his capacity as Bar Counsel for the State Bar of Nevada, to enjoin enforcement of Rule 199(1).

On September 18, 2002, Bare filed an Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. # 9.) Bare also filed Defendant's Exhibits to Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. # 10) on September 18, 2002. Michel filed Plaintiffs' Reply in Support of Motion for Preliminary Injunction (Doc. # 12) on October 7, 2002.

Rule 199(1) became effective on September 24, 2002. However, at the September 6, 2002, hearing on Michel's Motion for

Temporary Restraining Order, the parties stipulated that the State Bar would take no further enforcement action against Michel pending the resolution of the present litigation.

## II. LEGAL STANDARD

The Ninth Circuit uses two alternative tests to determine whether a preliminary injunction should issue. According to the "traditional test":

> The traditional equitable criteria for granting preliminary injunctive relief are: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to the plaintiffs if injunctive relief is not granted; (3) a balance of hardships favoring the plaintiffs; and (4) advancement of the public interest.

*Textile Unlimited, Inc. v. A..BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir.2001) (citing *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir.1980)). A preliminary injunction is "a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Id.* (citing *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

In the alternative, the Ninth Circuit uses a "sliding scale" or balancing test:

> Preliminary injunctive relief is available to a party who demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor.

*A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir.2001) (citing *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000)).

Additionally, pursuant to Federal Rule of Civil Procedure 65(a)(2), a United States District Court may consolidate "the hearing of an application for a preliminary injunction" with "the trial of the action on the merits." Fed.R.Civ.P. 65. At the hearing conducted on Plaintiffs' Motion for Preliminary Injunction on October 15, 2002, the parties agreed that all facts and applicable law were before the Court, and this action was ripe for full adjudication on its merits without the need for further trial.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Michel asserts that Rule 199(1) violates the First Amendment commercial speech doctrine as outlined in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York.* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Michel further contends that Rule 199(1) violates his Fourteenth Amendment right to equal protection.

Bare offers a variety of arguments in response. First, Bare asserts that several state supreme courts have upheld the regulation of trade names, and Nevada's regulations on the use of trade names should similarly be upheld. Second, relying principally on the United States Supreme Court's holding in *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), Bare contends that Nevada's regulation on the use of trade names by attorneys constitutes a permissible restriction on commercial speech. Third, Bare asserts that SCR 199(1) does not violate equal protection rights. Next, Bare contends that injunctive relief is not warranted because Michel can continue to use his current trade names—"Su Poder Legal" and "Your Legal Power"—as slogans. Finally, Bare claims that Michel will not suffer irreparable harm as a result of the enforcement of SCR 199(1).

## A. COMMERCIAL SPEECH

In *Central Hudson,* the United States Supreme Court articulated the following test for evaluating regulations of commercial speech:

In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, [1] it at least must concern lawful activity and not be *misleading.* Next, [2] we ask whether the asserted *governmental interest is substantial.* If both inquiries yield positive answers, we must determine [3] whether the regulation *directly advances* the governmental interest asserted, and [4] whether it is *not more extensive than is necessary* to serve that interest.

*Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343 (bracketed numbers and emphasis added). "[T]he Government bears the burden of identifying a substantial interest and justifying the challenged restriction." *Greater New Orleans Broad. Ass'n, Inc. v. United States,* 527 U.S. 173, 183, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (citing sources). *See also Valley Broad. v. United States,* 107 F.3d 1328 (9th Cir.1997).

In addition to laying out a general rule for testing the constitutionality of a commercial speech restriction, the United States Supreme Court has specifically addressed restriction of trade names as a form of commercial speech. *See generally Friedman,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100. The *Friedman* decision was rendered by the United States Supreme Court before *Central Hudson* and appears to allow greater regulation of trade names than does *Central Hudson.* However, the Court finds that Rule 199(1) does not survive either the *Friedman* or *Central Hudson* test.

## 1. *Friedman v. Rogers*

■ In *Friedman,* the United States Supreme Court held that a Texas law prohibiting the practice of optometry under a trade name was constitutional. *Friedman,* 440 U.S. at 8, 99 S.Ct. 887. The law in question in *Friedman* prohibited "the practice of optometry under an assumed name, *trade name,* or corporate name." *Id.* at 3, 99 S.Ct. 887 (emphasis added). In holding that the Texas law was constitutional, the Supreme Court reasoned that "restrictions on false, deceptive, and misleading commercial speech" are permissible, and "there is a significant possibility that trade names [in particular] will be used to mislead the public." *Id.* at 9, 99 S.Ct. 887. The Court noted that the concerns about the deceptive and misleading use of optometrical trade names in Texas "were not speculative or hypothetical . . . ." *Id.* at 13, 99 S.Ct. 887.

The present case deals with trade names, and *Friedman* does state that "there is a significant possibility that trade names will be used to mislead the public." *Friedman,* 440 U.S. at 12, 99 S.Ct. 887. However, the Court's conclusion in *Friedman* must be understood in the specific factual context presented:

The concerns of the Texas Legislature about the deceptive and misleading uses of optometrical trade names were not speculative or hypothetical, but were based on experience in Texas with which the legislature was familiar when in 1969 it enacted § 5.13(d). The forerunner of § 5.13(d) was adopted as part of a "Professional Responsibility Rule" by the Texas State Board of Examiners in Optometry in 1959. In a decision upholding the validity of the Rule, the Texas Supreme Court reviewed some of the practices that had prompted its adoption. *Texas State Bd. of Examiners in Optometry v. Carp,* 412 S.W.2d 307, *ap-*

*peal dismissed and cert. denied,* 389 U.S. 52, 88 S.Ct. 241, 19 L.Ed.2d 51 (1967).

*Id.* at 9, 99 S.Ct. 887 (footnote omitted). In a footnote, the Court pointed out:

When the Texas Legislature enacted the Texas Optometry Act in 1969, it included the Professional Responsibility Rule [mentioned above], with only minor changes, as § 5.13 of the Act. The purpose of the legislature was to continue the protection of the public from false, deceptive, and misleading practices by optometrists, as the preamble to § 5.13 makes clear.

"The provisions of this section are adopted in order to protect the public in the practice of optometry, better enable members of the public to fix professional responsibility, and further safeguard the doctor-patient relationship."

*Id.* at 14 n. 12, 99 S.Ct. 887. Thus, the *Friedman* Court found a direct link between the evidence of deceptive and misleading practices and the promulgated rule. Further, the Supreme Court confirmed in a later ruling that the restriction on trade names in *Friedman* was permissible "particularly in view of the considerable history in Texas of deception and abuse worked upon the consuming public through the use of trade names." *In re R.M.J.,* 455 U.S. 191, 202, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (citing *Friedman,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100).

By contrast, the evidence presented by Bare in the present case does not demonstrate a direct link between the alleged purposes of Rule 199(1) and the text of Rule 199(1). The only evidence which Bare contends addresses the motive behind the adoption of Rule 199(1) is contained in three sources: the MJP Report; statistics regarding the unauthorized practice of law; and an Affidavit submitted by Allen W. Kimbrough, the Executive Director of the State Bar.

The discussion in the MJP Report does not extensively address Rule 199(1), so its relevance to a determination on the purpose of Rule 199(1) is limited. Specifically, the MJP Report states:

The Commission was unanimous in its view that certain changes should be made to the current scheme in Nevada for the regulation of attorneys licensed in other jurisdictions. Such changes would provide protection for Nevada's citizens and business entities while expanding and clarifying the practice of law in this state by out-of-state practitioners. The Commission reached the following broad conclusions ... Current SCR 199 (firm names) should be replaced by ABA Model Rule 7.5 (with certain modifications) ....

(Pls.' Mot., Ex. 9, MJP Report, at 8.) The MJP Report states with respect to the trade names issue:

The Commission was unanimous that current SCR 199 should be replaced by the essence of ABA Model Rule 7.5. The Commission differed from the ABA drafters in the Commission's desire NOT to permit the use of artificial trade names except in the case of non-profit legal services providers (e.g., Clark County Legal Services) or to designate "the law offices of" or such nomenclature.

(*Id.* at 17, 99 S.Ct. 887 (emphasis in original).) At the hearing held on October 15, 2002, Bare argued that the Commission made its intent with respect to trade names clear by capitalizing the word "NOT." However, the capitalization of the word "NOT" only emphasizes the Commission's suggestion not to "permit the use of artificial trade names" except in certain circumstances. Neither the emphasis placed on "NOT" nor the text of the rest of the quoted section explain the Commis-

sion's reasoning behind the suggested changes to the ABA Model Rule.

On the other hand, under the heading "Multistate Law Firms," the MJP Report explains that three policy considerations generally guided its recommendations with respect to suggested changes:

The Commission's overriding concern (as with every issue related to MJP) was [1] the protection of Nevada's citizens from unlicensed practitioners and to make all attorneys who perform work in this state clearly subject to bar discipline and contributions to the client security fund. The Commission balanced that need with [2] the desire to find a mechanism for attorneys licensed in Nevada to practice effectively in a multistate law firm environment.... On the broader issue of the regulation of out-of-state law firms in Nevada ... the Commission worked from the primary view that [3] Nevada lawyers must be ultimately responsible for and accountable to the client and courts for all work performed on behalf of a Nevada client or performed within the state.

(Pls.' Mot., Ex. 9, MJP Report, at 17 (bracketed numbers added).) The fact that the MJP Report does not specifically mention Rule 199(1) in the context of concerns about misleading or deceptive trade names undermines the conclusion that the purposes behind Rule 199(1) were those asserted by Bare.

In addition to citing the MJP Report, Bare points to the fact that between February 1998 and February 2002, the State Bar "obtained six (6) permanent injunctions and one (1) contempt decree against various persons and organizations engaging in the unauthorized practice of law." (Def.'s Opp'n to Pls.' Mot. for T.R.O. & Prelim. Inj. [hereinafter "Def.'s Opp'n"] at 9.) However, Bare cites to the issuance of the permanent injunctions and contempt decree without providing this Court with any evidence that the injunctions and decree figured in the reasoning of the Supreme Court in adopting Rule 199(1). More critically, Bare acknowledged at the hearing conducted October 15, 2002, that the injunctions and contempt decree were obtained against non-lawyers engaged in the unauthorized practice of law under applicable Nevada Revised Statute 7.285 and Supreme Court Rule 195–both of which are unaffected by the adoption of Rule 199(1). Thus, the issuance of the permanent injunctions and contempt decree are irrelevant to the State Bar's interest in regulating lawyers.

Bare also submits an Affidavit by Allen W. Kimbrough ("Kimbrough"), Executive Director of the State Bar. In his Affidavit, Kimbrough avers that he attended every meeting of the Supreme Court Commission on Multijurisdictional Practice. (Def.'s Exs. to Def.'s Opp'n, Ex. 7, Aff. of Allen W. Kimbrough [hereinafter "Kimbrough Aff."] at ¶ 5.) Kimbrough also states:

[F]ollowing th[e] public hearings [held by the Commission established by the State Bar to study the issues related to multijurisdictional practice in Nevada], on October 24, 2001, the Commission first made its determination that artificial trade names should be prohibited in Nevada. It is my clear recollection that the Commission's determination was made in the context of the Commission's concerns over the "nominal presence" of law firms in the state, the proliferation of "storefront" operations in Nevada, and the overriding notion that Nevada citizens should be informed and aware of the identity of their counsel. Also in the trade name context, the Commission was concerned about the public's potential confusion between licensed attorneys operating under trade names and non-lawyers who use trade names to prey upon

the public and as a shield for the unauthorized practice of law.

(*Id.* at ¶ 7.)

In sum, the only evidence presented by Bare of a direct link between the asserted government interests and Rule 199(1) is in Kimbrough's Affidavit. Kimbrough's Affidavit, by itself, does not show that the government concerns about misleading and deceptive speech were not "speculative or hypothetical." *Friedman*, 440 U.S. at 13–14, 99 S.Ct. 887. As a result, the Court finds that Kimbrough's Affidavit is simply not sufficient evidence to enable this Court to conclude that Rule 199(1) passes the *Friedman* test.[1]

## 2. *Central Hudson*

Similarly, the Court finds that under the *Central Hudson* test, Rule 199(1) impermissibly infringes on Michel's First Amendment commercial free speech rights.

### a. Prong One

For commercial speech to have First Amendment protection, the speech "must concern lawful activity and not be misleading." *Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343. Bare relies on *Friedman* for the proposition that regulation of trade names is permissible because of the tendency of trade names to mislead the public. Bare's reliance on *Friedman* in this regard is misplaced. As stated previously, the *Friedman* holding is premised on the Court's conclusion, based on the evidence presented, that concerns about trade names being deceiving or misleading were

not merely "speculative or hypothetical." *Friedman*, 440 U.S. at 9, 99 S.Ct. 887. The kind of evidence that was present in *Friedman* is not present here, and Bare does not contend that Michel's Trade Names are misleading.

### b. Prong Two

Whether Rule 199(1) meets prong two of *Central Hudson* is debatable because Bare does not clearly state what substantial governmental interest Rule 199(1) advances. *Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343. *See also Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 183, 119 S.Ct. 1923.

The text of Rule 199(1) does not reveal a justification for the restriction on use of trade names, and as noted above, support for amendment of the Rule in the MJP Report is scant at best. The MJP Report does state that three general policy concerns guided the Commission's recommendations overall, to wit: protection of Nevada's citizens from unlicensed practitioners, the desire to find a mechanism for attorneys licensed in Nevada to practice effectively in a multistate law firm environment, and attorney responsibility and accountability. The three policy concerns cited in the MJP Report are unquestionably substantial interests. For purposes of analysis under the *Central Hudson* test, this Court will assume that the Commission intended to serve the foregoing three interests by enacting Rule 199(1).

---

1. Bare cited one additional case at the oral hearing as support for the constitutionality of Rule 199(1). In *Texans v. State Bar of Texas*, a district court in Texas upheld regulations on attorneys' use of trade names. 888 F.Supp. 1328, 1350 (E.D.Tex.1995), *aff'd by* 100 F.3d 953 (5th Cir.1996). The case does not help Bare here, however. First, the case—originating in the Fifth Circuit—is not binding on this Court. Second, the *Texans* court did not fully explain its reasoning with respect to upholding the regulation on trade names. The court merely noted that the regulation did "no more than require commercial information about legal services appear in such a form as is necessary to prevent it being deceptive." *Id.* (citation and quotation omitted).

### c. Prong Three

Even assuming that Rule 199(1) meets the first two prongs of the *Central Hudson* test, Bare has failed to demonstrate that Rule 199(1) "directly advances" any of the governmental interests, as required under prong three of the *Central Hudson* test. In evaluating whether a restriction "directly advances" an interest, "the State bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so 'to a material degree.'" *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (citing *Edenfield v. Fane*, 507 U.S. 761, 771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)). Showing that a restriction directly advances an interest to a "material degree" involves showing that the restriction "significantly" affects the interest in question. *Id.*

Bare has here failed to show that Rule 199(1) "directly advances" the substantial and legitimate interest in protecting Nevada's citizens from unlicensed practitioners. Neither the MJP Report, nor the Kimbrough Affidavit, nor the statistics regarding the unauthorized practice of law show that 199(1) would "significantly" advance this interest to a "material degree." *44 Liquormart*, 517 U.S. at 505, 116 S.Ct. 1495.

Neither does Rule 199(1) "directly advance" a state interest in facilitating the ability of Nevada attorneys to practice in a multistate law firm environment. Indeed, Rule 199(1) may actually inhibit the ability of Nevada's attorneys to do so because law firms from other states which allow the use of trade names cannot practice under those trade names in Nevada.

Finally, Bare has not met his burden with respect to explaining how Rule 199(1) directly advances an interest in increasing accountability of Nevada's attorneys.

Bare argues that requiring an attorney's name to appear in the firm name increases attorney accountability because a client is made aware of the attorney who is responsible for the firm's practice. However, the exceptions contained in Rule 199(1) undermine this conclusion about the way 199(1) would work. Firm names which contain the names of deceased or retired attorneys are exempted from the Rule, as are nonprofit legal services organizations. Thus, it is difficult to understand how the interest asserted by Bare is meaningfully advanced by the requirements of Rule 199(1), and the Court finds that Bare has failed to meet his burden under prong three of *Central Hudson.*

### d. Prong Four

Rule 199(1) also fails prong four of *Central Hudson*, which requires that the regulation not be "more extensive than is necessary to serve th[e] interest." *Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343. The *Central Hudson* test does not impose a "least-restrictive-means requirement." *Board of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). The Supreme Court has noted that:

> What our decisions require is a " 'fit' between the legislature's ends and the means chosen to accomplish those ends" ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," ... that employs not necessarily the least restrictive means but ... we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

*Id.* (internal citations omitted).

Supreme Court Rule 195 and Nevada Revised Statute 7.285 already restrict the deceptive and unauthorized practice of law.[2] As evidenced by the six permanent

---

**2.** Supreme Court Rule 195, "Communications  concerning a lawyer's services," states that

injunctions and contempt decree secured by the State Bar of Nevada between February 1998 and February 2002, the State Bar has demonstrated its ability to address its substantial interest in protecting Nevada's citizens. A blanket restriction on the use of trade names, beyond the existing Rule and Statute which already restrict false, deceptive, and misleading trade names, is more restrictive than necessary.

### 3. Other States' Treatment of Regulating Trade Name Use

Bare cites several cases for the proposition that regulation of trade name use in connection with attorneys serves to protect the public from being misled. *See, e.g., In re Conduct of Shannon,* 292 Or. 339, 638 P.2d 482, 484 (Or.1982) (finding that the law firm name "Shannon and Johnson's Hollywood Law Center" had no tendency to mislead the public as to the identity or

> "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services...."
>
> Nevada Revised Statute 7.285, "Unlawful practice of law; criminal penalties; initiation of civil action by State Bar of Nevada," states in relevant part:
> 1. A person shall not practice law in this state if the person:
> (a) Is not an active member of the State Bar of Nevada or otherwise authorized to practice law in this state pursuant to the rules of the supreme court; or
> (b) Is suspended or has been disbarred from membership in the State Bar of Nevada pursuant to the rules of the supreme court.
> ...
> 3. The State Bar of Nevada may bring a civil action to secure an injunction and any other appropriate relief against a person who violates this section.

**3.** Bare also cites *Simon v. Kentucky Bar Ass'n.* 742 S.W.2d 959 (Ky.1988). Bare claims that in *Simon,* "[t]he Supreme Court of Kentucky ... denied a petition to amend SCR 3.530(5) to allow practice under a trade name." (Def.'s Opp'n at 13.) This characterization of

services of a law firm, and therefore did not violate the ethical rule restricting the use of trade names) (citations omitted); *Matter of von Wiegen,* 63 N.Y.2d 163, 481 N.Y.S.2d 40, 470 N.E.2d 838, 845 (N.Y. 1984) (finding no violation of the rule prohibiting trade names because the trade name "The Country Lawyer" did not deceive the public). The cases cited by Bare, however, do not support the constitutionality of Rule 199(1).[3]

In *Shannon,* the Oregon Supreme Court found defendants not guilty in a disciplinary proceeding brought by the Oregon State Bar for defendants' allegedly unethical behavior. 638 P.2d at 482. In reaching the conclusion that the defendant attorneys did not violate the Oregon State Bar's Code of Professional Responsibility restricting the use of trade names, the Supreme Court reasoned:

*Simon* is incorrect. In *Simon,* the Supreme Court of Kentucky granted review of two Kentucky Bar Association advisory opinions pursuant to the review process *explained* in SCR 3.530(5). *Simon,* 742 S.W.2d at 959. The Court issued a conclusory opinion, declining to amend the ethical rules and commentary prohibiting use of trade names by attorneys. *Id.*

Finally, Bare cites *New York Criminal and Civil Courts Bar Ass'n v. Jacoby,* 92 A.D.2d 817, 460 N.Y.S.2d 309 (N.Y.1983). Bare quotes the statement from *Jacoby* which says "The client is entitled to know with whom he is dealing and what their legal background is." *Id.* at 819, 460 N.Y.S.2d 309 (Kupferman, J., dissenting). First, this statement comes from a dissent and thus carries no precedential value—a fact which Bare does not acknowledge. Second, the *Jacoby* decision has nothing to do with regulations on the use of trade names. In a short memorandum decision, the court held merely that two attorneys who did not practice in New York, and whose names appeared on firm stationery with asterisks and the notation "California bar only," did not violate any ethical rules. *Id.* at 818, 460 N.Y.S.2d 309.

[I]t appears that the purpose of DR 2–102(B) in its reference to "trade names" is not to protect the lawyers who use such names, but to protect the public by prohibiting the use of names by lawyers which "would mislead laymen concerning the identity, responsibility, and status" of those who use such names. *A "trade name," as that phrase is used in DR 2–102(B), is a word or phrase other than lawyers' names which tends to mislead the public* as to the identity or services of a law firm. We find that the name "Shannon and Johnson's Hollywood Law Center" ... has no such tendency.

*Id.* at 484 (footnote omitted and emphasis added). Thus, the *Shannon* Court read into the professional responsibility rule a requirement that a trade name be misleading in order for restriction to be proper.

Further, in *Von Wiegen,* the State Bar of New York disciplined Defendant Van Wiegen for, *inter alia,* using the trade name "The Country Lawyer" in a flyer. 481 N.Y.S.2d 40, 470 N.E.2d at 845. The State Bar concluded that Von Wiegen violated a state professional responsibility rule restricting the use of trade names. *Id.* at 840. The Court of Appeals of New York dismissed the charge on the grounds that "[t]he purpose of the prohibition against trade names ... [wa]s to prevent the public from being deceived about the identity, responsibility and status of those who use the name." *Id.* at 841 (citing *In re Conduct of Shannon,* 292 Or. 339, 638 P.2d 482). The Court reasoned, "[t]he use of the motto 'The Country Lawyer' did not deceive in that way." *Id.* As the court did in *Shannon,* the court in *Von Wiegen* read into the professional responsibility rule a requirement that a trade name be misleading in order for restriction to be proper.

In the present case, Bare does not contend that Michel's Trade Names are misleading or deceptive in any way. Further,

while Bare explains that other states have restricted the use of trade names because of concerns about their tendency to mislead and/or deceive, Bare does not point to specific evidence in the record that shows the same concerns motivated the Nevada Supreme Court in the adoption of 199(1). *Friedman* makes clear that for a restriction on trade name use to withstand constitutional scrutiny, the record must contain evidence of a history of deception in the state. *Friedman,* 440 U.S. at 13, 99 S.Ct. 887; *In re R.M.J.,* 455 U.S. at 202, 102 S.Ct. 929 (construing *Friedman*). Such evidence is entirely lacking here, and from the record adduced, was not before the Commission nor the Nevada Supreme Court at the time Rule 199(1) was enacted.

## C. Differential Treatment and Equal Protection

Michel asserts that the group distinctions on the face of Rule 199(1) violate the First Amendment because they allow one group—non-profit legal service organizations—to use trade names, whereas they do not allow for-profit firms to use trade names. Michel also contends that this distinction violates his Fourteenth Amendment right to equal protection.

### 1. First Amendment Differential Treatment

In support of his claim that Rule 199(1) is constitutionally infirm because of its disparate impact on Plaintiffs' commercial speech, Michel cites three cases. Generally, each of the three cases amounts to a straightforward application of the *Central Hudson* test.

In *City of Cincinnati,* the United States Supreme Court held that Cincinnati's "refus[al] to allow ... distribut[ion of] ... commercial publications through freestanding newsracks located on public property" was inconsistent with the protections

of the First Amendment. *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 412, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). The Court affirmed the lower court's application of the *Central Hudson* framework to the challenged regulation. *Id.* at 416, 113 S.Ct. 1505. In reaching its conclusion that the regulation did not "reasonabl[y] fit" with the City's asserted interest in esthetics, *id.* at 417, 113 S.Ct. 1505 (citing *Fox,* 492 U.S. at 480, 109 S.Ct. 3028), the Court highlighted the different treatment the City gave to newspapers:

> The city has asserted an interest in esthetics, but respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks. Each newsrack, whether containing "newspapers" or "commercial handbills" is equally unattractive.

*Id.* at 425, 109 S.Ct. 3028. Thus, the Court partially rested its opinion on the different treatment afforded two groups under the regulation.

In *Greater New Orleans Broadcasting,* the United States Supreme Court held that "[18 U.S.C.] § 1304 [which prohibits the broadcast advertising of gambling in some instances] may not be applied to advertisements of private casino gambling that are broadcast by radio or television stations located ... where such gambling is legal." 527 U.S. at 176, 119 S.Ct. 1923. In reaching this conclusion, the Court systematically applied the *Central Hudson* test to the regulation in question. *Id.* at 184–95, 119 S.Ct. 1923. While the Court found that prongs one and two of *Central Hudson* were met (i.e., that the restricted speech was not misleading, and the government asserted a substantial interest), the Court found that the regulation failed prongs three and four of *Central Hudson.* *Id.* at 185–86, 188, 119 S.Ct. 1923. In finding that the asserted government interests were not "directly and materially advance[d]" by a restriction that was "no

more extensive than necessary," *id.* at 188, 119 S.Ct. 1923, the Court relied in part on the observation that the exceptions to § 1304 and the attendant regulatory scheme were pervasive. *Id.* at 190, 119 S.Ct. 1923. The Court reasoned that the Government's argument that prongs three and four of the test were met was undermined by the observation that "[unregulated] tribal casinos offer precisely the same types of gambling as the [regulated] private casinos." *Id.* at 191, 119 S.Ct. 1923. Thus, the Court, once again, rested part of its reasoning on the fact that the Government applied the regulations differently to different groups.

Finally, in *Rubin v. Coors Brewing Co.,* the Supreme Court upheld the invalidation of a section of the Federal Alcohol Administration Act which prohibited beer labels from displaying alcohol content. 514 U.S. at 478, 115 S.Ct. 1585. The Court's analysis involved a straightforward application of the *Central Hudson* test to the regulation in question. *Id.* at 482, 115 S.Ct. 1585. The Court noted that the regulation met the first and second prongs of the *Central Hudson* test, but went on to conclude that the regulation did not have an "acceptable fit with the Government's goal." *Id.* at 483, 115 S.Ct. 1585. In its analysis, the Court recognized that the Government did not ban labels bearing alcoholic content on wine and distilled spirits. *Id.* at 485, 115 S.Ct. 1585. The Court used this fact in part to determine that one of the Government's two asserted interests—facilitating state efforts to regulate alcohol—was not "sufficiently substantial to meet the requirements of *Central Hudson.*" *Id.* at 486, 115 S.Ct. 1585. Because the Court found that the Government's interest in curbing "strength wars" was substantial, however, *id.* at 485, 115 S.Ct. 1585, the Court continued in its *Central Hudson* analysis. In concluding that the regulation in question did not "directly and

materially advance [the Government's] asserted interest," the Court partially relied on the "overall irrationality of the Government's regulatory scheme." *Id.* at 488, 115 S.Ct. 1585. The Court pointed out that the challenged regulation "ban[ned] the disclosure of alcohol content on beer labels, [but] it allow[ed] the exact opposite in the case of wines and spirits." *Id.* at 488, 115 S.Ct. 1585. In both the Court's analysis with respect to the second prong of *Central Hudson* and prongs three and four of *Central Hudson,* then, the Court's determination turned in part on the different treatment afforded different groups.

Here, Rule 199(1) arguably has the same flaw as was evident in *City of Cincinnati, Greater New Orleans Broadcasting,* and *Rubin.* Rule 199(1) treats non-profit legal service organizations and for-profit law firms differently, and differentiates without any apparent basis between certain kinds of firm names—those firm names containing the names of deceased or retired firm members, for example, are not prohibited from using the firm name as a trade name. Thus, Rule 199(1) provides greater First Amendment protection to some groups as compared to other groups. By analogy to *City of Cincinnati, Greater New Orleans Broadcasting,* and *Rubin,* Rule 199(1) does not "reasonably fit" with the asserted government interests.

### 2. Equal Protection

■ Michel contends that Rule 199(1):

> ... impermissibly permits certain organizations (nonprofit organizations are allowed to operate under designated trade names, and private firms are allowed to use the names of deceased or retired members) to engage in speech while prohibiting plaintiffs and others similarly situated from using trade names for their for-profit law firms.

(Pls.' Mot. at 13.) Thus, Michel contends that the distinctions in Rule 199(1) infringe on his right to equal protection. Michel asserts that the government cannot treat similarly situated speakers differently without any justification or rationale. Bare responds that because the *Friedman* Court heard and rejected a similar equal protection challenge, this Court is constrained to do the same.

The cases cited by Michel in support of his equal protection claim are, for the most part, inapplicable here. Michel cites two cases for the proposition that the government cannot treat similarly situated speakers differently without any justification or rationale—*Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), and *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). These cases do generally stand for the proposition that the government must give some rationale for different treatment of similarly situated speakers. *Carey,* 447 U.S. at 461–62, 100 S.Ct. 2286 ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."); *Mosley,* 408 U.S. at 98, 92 S.Ct. 2286 ("And to deny this appellant and his group use of the streets because of their views against racial discrimination, while allowing others to use the streets to voice their opinions on other subjects also amounts ... to an invidious discrimination forbidden by the Equal Protection Clause of the Fourteenth Amendment.") (quoting *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965)). However, both *Carey* and *Mosley* deal with individual First Amendment speech rights, not the First Amendment protections associated with commercial speech.

By comparison, the *Friedman* Court squarely addressed equal protection in the context of commercial speech. That Court upheld as constitutional § 2.02 of the Texas Optometry Act, a requirement "that four of the six members of the State's regulatory board ... be members of the Texas Optometric Association, a professional organization of optometrists." *Friedman,* 440 U.S. at 19, 99 S.Ct. 887. In *Friedman,* the Court used a rational basis test to uphold the requirement. *Id.* at 17, 99 S.Ct. 887 ("The history of the [Texas Optometry] Act shows that § 2.02 is related reasonably to the State's legitimate purpose of securing a Board that will administer the Act faithfully.").

The relatively low bar of the rational basis test is met in this case. Nevada has a legitimate interest in protecting its citizens from unlicensed practitioners, in making attorneys who practice in Nevada subject to bar discipline, fostering effective multijurisdictional practice, and regulating out-of-state law firms in Nevada. (*See* Pls.' Mot., Ex. 9, MJP Report, at 17; Kimbrough Aff. at ¶¶ 5, 7.) Whether or not the regulation directly advances these interests, as is required by the commercial speech doctrine, the regulation is at least "reasonably related" to these legitimate government interests, and Rule 199(2) therefore passes the equal protection challenge.

### D. The Necessity of Injunctive Relief

■ Michel contends, and the Court agrees, that he will suffer irreparable harm if the State Bar enforces Rule 199(1) against him. In First Amendment cases, irreparable harm is essentially presumed. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (per Justice Brennan, with two Justices concurring and two Justices concurring in the result)). *See also Topanga Press, Inc. v. City of L.A.,* 989 F.2d 1524, 1528 (9th Cir.1993) ("'[A]ny loss of First Amendment free-

doms, even briefly, can constitute irreparable injury.'") (quoting *Lydo Enters. Inc. v. City of Las Vegas,* 745 F.2d 1211, 1213 (9th Cir.1984)).

On a practical level, Michel has a great deal of capital invested in the use of the Trade Names. If this Court were to deny Michel relief, Michel would be required to suspend his use of advertisements, firm stationery, and firm literature—or else risk adverse action by the State Bar of Nevada. (*See* Pls.' Mot., Ex. 8, letter from Rob W. Bare to Herbert Michel, Jr., Esq. of Aug. 20, 2002. *See also* Pls.' Mot., Ex. 3, Sprint phone book advertisement; *Id.* at Ex. 4, Pamphlet; *Id.* at 5, Preferred Client Card; *Id.* at 6, Envelope; *Id.* at 7, Stationery.)

■ Bare asserts that injunctive relief is not warranted because Michel can continue to use his current trade names as "slogans," although Bare offers no explanation or guidelines as to precisely what the word "slogans" might encompass. The Court must reject Bare's arguments for two reasons. First, Rule 199(1) does not "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park Dist.,* 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002) (citing *Niemotko v. State of Md.,* 340 U.S. 268, 271, 71 S.Ct. 328, 95 L.Ed. 280 (1951). Bare has provided no evidence to this Court that his discretion is subject to clear guidelines or standards. Second, even a content-neutral time, place, or manner restriction must be narrowly tailored to serve a significant government interest. *See generally Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

### IV. CONCLUSION

The State Bar of Nevada and the Nevada Supreme Court have a substantial and

legitimate interest in prohibiting the unauthorized practice of law as well as a legitimate interest in promoting attorney accountability and in facilitating the ability of Nevada's attorneys to practice in a multistate environment. These legitimate and substantial interests are well served by the provisions of Nevada Revised Statute 7.285, Supreme Court Rule 195, and that portion of Supreme Court Rule 199(1) which remains unchallenged in this case. Michel, however, also enjoys substantial First Amendment commercial speech rights in the Trade Names at issue. Part of Rule 199(1) violates Michel's rights and at the same time fails to advance any of the substantial state interests cited by Bare. Michel is, therefore, entitled to receive the declaratory and injunctive relief requested.

IT IS THEREFORE ORDERED that Declaratory Judgment is hereby entered in favor of Plaintiff Michel and against Defendant Bare and that Nevada Supreme Court Rule 199(1) is hereby declared to constitute a violation of Michel's First Amendment commercial speech rights.

IT IS FURTHER ORDERED that Michel's request for injunctive relief is hereby granted and that Defendant Bare is hereby enjoined from enforcing the provisions of Rule 199(1) against Plaintiff Michel.